IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CV-355-D

| | | |
|---|---|---|
| JAMES R. BUSCH, M.D., ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | **ORDER** | |
| ) | | |
| OHIO NATIONAL LIFE ASSURANCE ) | | |
| CORPORATION, ) | | |
| ) | | |
| Defendant. ) | | |

On July 8, 2009, Dr. James R. Busch ("plaintiff" or "Busch") sued Ohio National Life Assurance Corporation ("defendant" or "Ohio National") in Wake County Superior Court. Busch alleges breach of contract and unfair and deceptive trade practices by Ohio National for rescinding Busch's disability insurance policy. On August 7, 2009, Ohio National removed this action to the United States District Court for the Eastern District of North Carolina [D.E. 1]. On August 31, 2009, Ohio National filed its answer to the complaint and asserted the affirmative defenses of fraud and fraud in the inducement [D.E. 6]. On August 16, 2010, Ohio National moved for summary judgment [D.E. 28]. On October 12, 2010, Busch responded in opposition [D.E. 34]. On November 9, 2010, Ohio National replied [D.E. 37]. As explained below, the court grants in part and denies in part Ohio National's motion for summary judgment.

I.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Busch was a pediatrician practicing in Wilson, North Carolina from 1985 until 2007. Busch Dep. 7. After Busch moved to Wilson, North Carolina, he began seeing his colleague Dr. Scott Bowers ("Bowers"), an ophthalmologist, for corrective lenses and eye examinations. Id. at 19–20, 23. During an eye examination on November 7, 1990, Bowers noted transillumination defects in Busch's eyes, which indicated that there was pigment on the back side of Busch's iris which was flaking off. Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 8 (Busch's Ophthalmology Records); Fleming Dep. 55. Bowers also discovered Krukenberg spindles ("K-spindles") in both eyes. Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 8. According to Dr. Christopher Fleming ("Fleming"), these findings indicated that Busch had pigment dispersion syndrome and was at risk for developing pigmentary glaucoma. Fleming Dep. 60.[1] Fleming testified that he would have communicated these findings to a patient and that it was reasonable to conclude Bowers communicated his findings to Busch. Id.[2] On July 31, 1991, Bowers or his staff examined Busch again and noted that Busch's intraocular eye pressures were asymmetrical and the pressure in Busch's left eye was outside the normal range. Id.

---

[1] Bowers died in 2002. Busch Decl. ¶ 31. Therefore, the parties and the court rely upon Busch's medical records, Busch's declaration and deposition, and the testimony of Dr. Christopher Fleming, Busch's designated expert, regarding Busch's condition.

[2] Busch testified that Bowers did not tell him he had been diagnosed with pigment dispersion syndrome or early pigmented glaucoma. Busch Dep. 41–42.

2

at 63; Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 9. Bowers conducted a visual field test, which Busch remembers, describing the test as "awful" and "not much fun." Fleming Dep. 64; Busch Dep. 31. On August 7, 1991, Bowers met with Busch, diagnosed him with ocular hypertension, and scheduled a check-up for further observation after six to nine months. Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 10; Fleming Dep. 66. Busch returned for regular check-ups at Bowers's office in May 1993, May 1995, and May 1996. Fleming Dep. 73, 75–76.

On May 29, 1996, Bowers examined Busch and again noted the presence of K-spindles and transillumination defects in both of Busch's eyes. Id. at 77; Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 14. Bowers's notes describe Busch's eyes as "heavily pigmented" and diagnose Busch's condition as "early pigmented glaucoma." Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 14. Thereafter, Bowers planned to see Busch yearly for observation and to run visual field tests. Id. Fleming testified that Bowers's notes probably meant to say Busch was "glaucoma suspect," because Bowers did not begin treating Busch for glaucoma. Fleming Dep. 78–80. Thus, according to Fleming, Busch had developed pigment dispersion syndrome but was not suffering from glaucoma in May 1996. See id. Fleming explained that Bowers likely was concerned Busch might develop glaucoma and, therefore, wanted to continue to monitor his condition to discover glaucoma at the earliest stages. Id. Fleming said it is common to conduct visual field tests on glaucoma and glaucoma suspect patients once a year, but that he would not do so with a normal patient. Id. at 82. Fleming testified that he would have explained these findings to the patient and that it appeared Bowers explained this information to Busch. Id. at 81–82. However, according to Busch, Bowers did not tell him in 1996 he had been diagnosed with early pigmented glaucoma or any other condition. Busch Dep. 41–42, 60–61. Busch only remembers Bowers telling him that Busch's intraocular eye pressures were in the upper limits of normal, and that Bowers would need to check Busch's intraocular eye pressures and conduct visual field tests yearly to make sure Busch did not develop glaucoma. Id. On August 21, 1996, Busch returned for another eye examination and saw Bowers's colleague, Dr. Shawn Putman

("Putman"). Busch Dep. 45; Pl.'s Opp'n Mot. Summ. J., Ex. 4 at 15. Putman noted the presence of a corneal edema and treated Busch for an infection with the drug Tobradex. Busch Dep. 47.

In October 1996, two months later, Busch completed an application for disability insurance with Ohio National. Def.'s Mem. Supp. Mot. Summ. J., Ex. 5 (Busch's Insurance Application). On October 15, 1996, Busch completed Part 2 of the insurance application form, which included a physical examination by Victoria M. Moore ("Moore") and questions about Busch's medical history. Id. at 14–15. The application asked, in relevant part:

5. HAVE YOU EVER:
   . . . .
    c. had pain or other discomfort in the chest?
   . . . .
6. HAVE YOU EVER HAD ANY OF THE FOLLOWING:
   . . . .
    i. disorder of the skin, eyes, ears, nose, sinuses, throat or larynx?
   . . . .
7. HAVE YOU WITHIN THE PAST 5 YEARS, OTHER THAN NOTED ABOVE,
    a. had a checkup, consultation, illness, injury, surgery?
    b. been a patient in a hospital, clinic or sanatorium?
    c. had an electrocardiogram, x-ray or other diagnostic tests?
   . . . .
9. ARE YOU NOW UNDER OBSERVATION OR TAKING TREATMENT?

Id. at 14. Busch answered "yes" to question 5(c) and "no" to all the other questions. Id. The application explained that for any affirmative answers, the applicant should identify the question number and include the diagnoses, dates, durations, names and addresses of all attending physicians and medical facilities. Id. According to Busch, Moore read the questions aloud and recorded Busch's verbal answers. Busch Decl. ¶ 12. Busch does not specifically remember filling out Part 2 of the application, but believes that the application accurately reflects his answers to the questions. Busch Dep. 12.

Busch signed the application, which contained a certification stating: "I represent that the above statements and answers were made by me, are correctly recorded and are true and complete to the best of my knowledge and belief." Def.'s Mem. Supp. Mot. Summ. J., Ex. 5 at 14. Busch also gave Ohio National authorization to obtain any information, records, or knowledge about his

4

physical or mental condition from his health care providers. Id. As a result of Busch's affirmative answer to question 5(c), Ohio National obtained medical records from Dr. John Lund, Busch's treating physician. Ashley Aff. ¶ 9. Ohio National reviewed and considered these medical records before issuing Busch's policy. Id. According to Mark Ashley, an underwriter for Ohio National, the company also would have requested additional information regarding Busch's health condition if Busch had answered "yes" to any of the other questions. Id. ¶ 12. Ohio National relied on Busch's negative responses to the other questions in deciding to issue Busch's disability insurance policy. Id. ¶ 11.

On December 18, 1996, Ohio National issued a Disability Income Policy ("Policy") to Busch. Def.'s Mem. Supp. Mot. Summ. J., Ex. 7 (hereinafter "Policy"). The Policy provided that Busch would receive monthly disability payments in the event Busch became disabled and was no longer able to perform the duties of his occupation as a pediatrician. Compl. ¶¶ 6–7; Policy. The Policy also contained a time limit on certain defenses:

> After this policy has been in force for 2 years . . . [Ohio National] can use only fraudulent misstatements in your application to void this policy or to deny a claim for Total Disability that starts after the end of those 2 years.
>
> [Ohio National] cannot reduce or deny a claim for Total Disability that starts after 2 years from the Policy Date on the grounds that a sickness or a physical condition had existed before the Policy Date, unless:
>     (a) [Ohio National] excluded it by name or specific description before the date of loss; or
>     (b) there were fraudulent misstatements on your application.

Policy 9.

In June 2007, Busch submitted a claim to Ohio National for disability insurance after Busch developed glaucoma in both eyes. Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 (Busch's Disability Claim). Busch submitted a letter along with his claim form, in which he stated that he had suffered from "moderate glaucoma for several decades." Id. at 7. On September 26, 2007, during an interview with a field representative from Ohio National, Busch again said that he had been diagnosed with glaucoma between 1985 and 1990. Id., Ex. 6 (Claim File) at 69 (Interview Notes).

5

However, after having the opportunity to review his medical records, Busch clarified that he has a bad memory regarding dates and his earlier statements were a mistake. Busch Dep. 54–55; Busch Decl. ¶¶ 19, 25–27. According to Busch and Fleming, Busch was not diagnosed with glaucoma until July 22, 1998. Id.; Busch Decl. ¶ 19; Fleming Expert Report 1.

After Busch submitted his disability claim, Ohio National obtained and reviewed the records relating to Busch's medical treatment from Dr. Bowers between 1984 and 1996. Ashley Aff. ¶ 6. Ashley explained that if Busch had answered questions 6(i), 7(a)–(c), or 9 in the affirmative, Ohio National would have requested additional information from Busch and his healthcare providers regarding his condition. Id. ¶ 12. Moreover, Ashley states that Ohio National would not have issued Busch's policy as written if Busch had disclosed the records of his check-ups, consultations, and treatment by Bowers between 1984 and 1996. Ashley Aff. ¶¶ 13–14. Specifically, Ashley notes that if Ohio National had continued with the issuance of the disability policy, it would have included a rider excluding claims for disability due to any condition involving Busch's eyes. Id. ¶ 14.

After reviewing Busch's claim, medical records, and original application, Ohio National concluded that Busch had made fraudulent misstatements in his application and rescinded the Policy. Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 (Claim File) at 108–10. Busch contacted Ohio National and asked them to reconsider their decision, claiming that he had not made any fraudulent misstatements and that Ohio National had rescinded the Policy based on inaccurate information. See id. at 118–21, 131, 137–38, 149–52. Ohio National reviewed Busch's requests but refused to reinstate the Policy, concluding that Busch had intentionally failed to disclose information relating to his eye condition, as well as the consultations, check-ups, diagnostic tests, observation, and treatment provided by Bowers. See id. at 124–25, 143–145, 154–55.

Busch maintains that he did not intentionally make any false statements on his application for disability insurance. Busch says he considers eye care to be a separate category from regular medical care, because "[e]veryone who wears corrective lenses gets eye care of some sort." Busch

6

Case 5:09-cv-00355-D   Document 38   Filed 03/14/11   Page 6 of 11

Decl. ¶ 18. Busch explained that he did not consider his eye examinations to be "check-ups." Busch Dep. 66–68. Thus, Busch says he "didn't even think about [his eye examinations]" when responding to the questions. Id. at 68. Likewise, Busch explained that although a visual field test may be a "diagnostic test," he did not consider it when he answered the questions. See id. at 66–67. Busch also claims that, based on his typical work schedule at the time, he likely would have been in a hurry when he signed the application on the morning of October 15, 1996. Busch Decl. ¶¶ 14–17.

II.

The Policy permits Ohio National to rescind the Policy if Busch made fraudulent misstatements in his application. Policy 9. Ohio National has raised the affirmative defense of fraud and fraud in the inducement. Answer ¶¶ 49–67. To prove fraud under North Carolina law, Ohio National must show Busch's insurance application contained: (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) that did in fact deceive, and (5) resulted in damage to the injured party. Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); Ellison v. Alexander, 700 S.E.2d 102, 107 (N.C. Ct. App. 2010). An applicant's representations in an insurance application are "material" if the information "would naturally influence the judgment of the insurer in making the contract." Goodwin v. Investors Life Ins. Co., 332 N.C. 326, 331, 419 S.E.2d 766, 769 (1992); Luther v. Seawell, 191 N.C. App. 139, 144, 662 S.E.2d 1, 4 (2008). Although materiality is generally a question of fact for the jury, an applicant's representations in an insurance application regarding his health are material as a matter of law. Tharrington v. Sturdivant Life Ins. Co., 115 N.C. App. 123, 127, 443 S.E.2d 797, 800 (1994); Pittman v. First Prot. Life Ins. Co., 72 N.C. App. 428, 433, 325 S.E.2d 287, 291 (1985). An applicant's reckless disregard for the truth of a statement may be sufficient to satisfy the element of "false representation," but it is not sufficient to satisfy the "intent to deceive" requirement. Myers

7

& Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568–69, 374 S.E.2d 385, 391–92 (1988); RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 745, 600 S.E.2d 492, 499 n.2 (2004); see Taylor v. Gore, 161 N.C. App. 300, 303, 588 S.E.2d 51, 54 (2003).

Summary judgment is normally not appropriate when a person's state of mind is decisive as to an element of a claim or defense. See Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). After all, the intent of a party is generally within the exclusive knowledge of that party and must be proved by circumstantial evidence. See Canady v. Mann, 107 N.C. App. 252, 258–59, 419 S.E.2d 597, 601 (1992). The required scienter for "intent to deceive" is not present without both knowledge and an intent to deceive, manipulate, or defraud. Myers & Chapman, Inc., 323 N.C. at 568, 374 S.E.2d at 391; Latta v. Rainey, 689 S.E.2d 898, 909 (N.C. Ct. App. 2010).

Here, there is a genuine dispute over material facts regarding Busch's intent to deceive Ohio National when he completed his insurance application form. See, e.g., Canady, 107 N.C. App. at 258–59, 419 S.E.2d at 601. Thus, the court denies summary judgment on Ohio National's affirmative defenses of fraud and fraud in the inducement.

III.

To prevail on his unfair and deceptive trade practices claim, Busch must present evidence that Ohio National engaged in "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Walker v. Fleetwood Homes of N.C., Inc., 176 N.C. App. 668, 671, 627 S.E.2d 629, 631 (2006) (quotation omitted); see Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000); N.C. Gen. Stat. § 75-1.1. A practice is unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and a practice is deceptive if it "has the capacity or tendency to deceive." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981); see Gray, 352 N.C. at 68, 529 S.E.2d at 681. A mere breach of contract, even if intentional, is not an unfair or deceptive act under N.C. Gen. Stat. § 75-1.1. See, e.g., PCS

8

Phosphate Co. v. Norfolk S. Corp., 559 F.3d 212, 224 (4th Cir. 2009); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998); Mosley & Mosley Builders, Inc. v. Landin Ltd., 97 N.C. App. 511, 518, 389 S.E.2d 576, 580 (1990). The Act's provisions apply only if a plaintiff alleges and proves some type of "egregious or aggravating circumstances." Dalton v. Camp, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001); Carcano v. JBSS, LLC, 684 S.E.2d 41, 49–50 (N.C. Ct. App. 2009); Bus. Cabling, Inc. v. Yokeley, 182 N.C. App. 657, 663, 643 S.E.2d 63, 68 (2007). Whether a particular practice constitutes an unfair or deceptive trade practice is a question of law for the court. Dalton, 353 N.C. at 656, 548 S.E.2d at 711. Therefore, if the material facts are not disputed, the court should determine whether a defendant committed an unfair or deceptive trade practice. Stott v. Nationwide Mut. Ins. Co., 183 N.C. App. 46, 53, 643 S.E.2d 653, 658 (2007).

Busch alleges that Ohio National committed unfair and deceptive trade practices by:

[1.] Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

[2.] Refusing to pay claims without conducting a reasonable investigation based upon all available information;

[3.] Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and]

[4.] Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Compl. ¶ 42; see N.C. Gen. Stat. § 58-63-15(11) (statute governing insurance law). The court examines each allegation seriatim.

First, Busch alleges Ohio National failed to adopt and implement reasonable standards for the prompt investigation of his claim. Compl. ¶¶ 43, 47; see N.C. Gen. Stat. § 58-63-15(11)(c). However, Busch has provided no evidence of how Ohio National failed to adopt and implement reasonable standards; therefore, Busch cannot show an unfair or deceptive trade practice regarding Ohio National's adoption and implementation of reasonable standards. See, e.g., Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 611, 630 S.E.2d 221, 232–33 (2006).

9

Second, Busch alleges Ohio National refused to pay his claim without conducting a reasonable investigation based upon all available information. Compl. ¶¶ 44, 47; see N.C. Gen. Stat. § 58-63-15(11)(d). Contrary to Busch's allegation, the record demonstrates that Ohio National conducted a thorough and reasonable investigation. On June 1, 2007, Ohio National sent Busch a letter and enclosed standard forms necessary to begin evaluating his claim. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 (Claim File) at 11–12. On June 26, 2007, Ohio National sent Busch another letter reminding Busch to submit the forms because the information was necessary to evaluate his claim. Id. at 27. On July 6, 2007, Ohio National sent Busch a letter requesting additional information that he had not included in his original responses. Id. at 30. On September 26, 2007, an Ohio National field representative interviewed Busch to confirm information regarding his claim. Id. at 69. The record shows that Ohio National conducted a thorough and reasonable investigation and accounted for the information that Busch provided. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 (Claim File) at 124–25, 143–45, 154–55. Moreover, Ohio National's investigation was not unethical, unscrupulous, unfair, or deceptive.

Third, Busch alleges Ohio National did not attempt in good faith to effectuate a prompt, fair, and equitable settlement of Busch's claim in which liability was clear. Compl. ¶¶ 45, 47; see N.C. Gen. Stat. § 58-63-15(11)(f). Because liability is not "reasonably clear" in Busch's case, this argument fails. See, e.g., Riddle v. Auto-Owners Ins. Co., No. 2:08-CV-1-F, 2009 WL 2151386, at *4 n.2 (E.D.N.C. July 17, 2009) (unpublished). Busch submitted a letter along with his disability claim in which he stated that he had suffered from "moderate glaucoma for several decades." Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 at 7. On September 26, 2007, during an interview with a field representative from Ohio National, Busch again said that he had been diagnosed with glaucoma between 1985 and 1990. Id., Ex. 6 (Claim File) at 69 (Interview Notes). These statements contradicted Busch's answers in his insurance application and prompted Ohio National to investigate Busch's medical history. After this investigation, Ohio National concluded that Busch had failed

to disclose material information regarding consultations, check-ups, eye examinations, and Bowers's diagnosis that Busch suffered from early pigmented glaucoma. See id. at 143–45, 154–55. Ohio National specifically noted that Busch's medical records indicated he had consultations and check-ups just four months before completing his application. Id. at 154. Based on this information, Ohio National concluded Busch had fraudulently misrepresented information on his application. Id. at 154–55. Ohio National's actions do not constitute an unfair or deceptive trade practice.

Finally, Busch alleges Ohio National failed to provide a reasonable explanation of the basis for denying his claim. Compl. ¶¶ 46–47; see N.C. Gen. Stat. § 58-63-15(11)(n). Again, the record belies this assertion. Ohio National's explanation for the decision was reasonable, and it was not unfair or deceptive. See Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 (Claim File) at 124–25, 143–45, 154–55.

In sum, no rational jury could find facts to support the legal conclusion that Ohio National committed any unfair or deceptive acts within the meaning of N.C. Gen. Stat. §§ 58-63-15(11) or 75-1.1. Rather, the record shows that Ohio National acted reasonably. Therefore, the court grants Ohio National's motion for summary judgment as to Busch's unfair trade practices claim.

IV.

As explained above, Ohio National's motion for summary judgment [D.E. 28] is GRANTED IN PART and DENIED IN PART. The court DENIES summary judgment on Ohio National's affirmative defenses of fraud and fraud in the inducement. The court GRANTS summary judgment on Busch's unfair and deceptive trade practices claim and DISMISSES that claim.

SO ORDERED. This 14 day of March 2011.

JAMES C. DEVER III
United States District Judge